**TANTALO & ADLER LLP**
Joel M. Tantalo, SBN 206096
  email: jtantalo@ta-llp.com
Michael S. Adler, SBN 190119
  email: madler@ta-llp.com
1801 Century Park East, Suite 2400
Los Angeles, CA 90067-6012
Tel:   (310) 734-8695
Fax:   (310) 734-8696

Attorneys for non-party Harold Eisner

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| ROSLYN LA LIBERTE,<br><br>Plaintiff,<br><br>v.<br><br>JOY REID<br><br>Defendant. | **CASE NO.**<br><br>**DECLARATION OF JOEL M. TANTALO**<br><br>**IN SUPPORT OF NON-PARTY HAROLD EISNER'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL COMPLIANCE WITH DEPOSITION SUBPOENA** |

**DECLARATION**

I, Joel M. Tantalo, hereby declare:

1.      I am over the age of eighteen and I am making this declaration based on my own personal knowledge. If called upon as a witness, I would and could testify competently to the matters declared herein.

2.      I am an attorney licensed to practice law in the States of California and New York and a partner at Tantalo & Adler LLP, counsel of record for non-party respondent Harold Eisner. I submit this declaration in support of Mr. Eisner's opposition to plaintiff's motion to compel compliance with a subpoena to testify at a deposition in a civil action.

3.      On August 2, 2021, I emailed plaintiff's counsel, Ronald Mysliwiec, to inform Mr. Mysliwiec that I would be representing Mr. Eisner with respect to the subpoena served on Mr. Eisner, advised Mr. Mysliwiec that I was not available on the date scheduled for the deposition, and invited a call to discuss the substantive issues surrounding the requested deposition. A true and correct copy of my August 2nd email to Mr. Mysliwiec is attached hereto as <u>Exhibit 1</u>.

4.      Mr. Mysliwiec did not respond to my August 2nd email, so on August 5, 2021, I sent Mr. Mysliwiec a detailed letter raising objections to the subpoena and inviting a meet-and-confer pursuant to the local rules if plaintiff still sought to depose Mr. Eisner. A true and correct copy of my August 5th letter, which was sent to Mr. Mysliwiec by email and first-class U.S. mail, is attached hereto as <u>Exhibit 2</u>.

5.      Mr. Mysliwiec did not initially respond to my August 5th letter, either, or otherwise communicate with me until August 23, 2021 (18 days later). On August 23rd, Mr. Mysliwiec emailed me and asked "[w]hen will it be convenient to speak about the deposition of Hal Eisner?" A true and correct copy of Mr. Mysliwiec's August 23rd email to me is attached hereto as <u>Exhibit 3</u>.

6.      Mr. Mysliwiec and I then spoke by telephone on Monday, August 30, 2021. This commenced a meet-and-confer process that spanned eleven days and numerous

telephone calls and emails. During our August 30th call, Mr. Mysliwiec informed me that plaintiff sought only a very limited deposition to "authenticate" Mr. Eisner's published news report. Mr. Mysliwiec confirmed that limitation in an email to me on September 1, 2021, clarifying that plaintiff "seeks neither sources nor unpublished material from Mr. Eisner at his deposition. [She] simply needs him to authenticate his interviews of Mr. Luevanos and Ms. La Liberte as broadcast on Channel 11 on June 29, 2018, as fair, accurate and correct representations of those interviews."[1] A true and correct copy of Mr. Mysliwiec's September 1st email to me is attached hereto as <u>Exhibit 5</u>.

7.   Later in the afternoon on September 1st, Mr. Mysliwiec sent me another email. In that email, Mr. Mysliwiec said that "As I told you on the telephone earlier today, since we are seeking neither Mr. Eisner's sources nor any unpublished materials relating to his June 29, 2018 interviews of Ms. La Liberte and Mr. Luevanos, are [*sic*] subpoena to Mr. Eisner is not barred by either the U.S. Constitution, the CA Constitution or the CA Rules of evidence. Moreover, for the same reason, no 'balancing test' or other, heightened requirement is applied here. Only FRCP Rule 26 controls. The information sought must merely be relevant to any party's claim or defense. Rule 26 says relevant, not dispositive." Mr. Mysliwiec continued, "It is my best information that both Joseph Luevanos and his mother, Ruth, have testified at their depositions that Mr. Eisner or Channel 11 cut parts of the interview before it was aired. In the interview and in the broadcast thereof, Joseph says that Ms. La Liberte was civil to him at all times. At their depositions both mother and son said that during the interview Joseph said that Ms. La Liberte was "civil compared to others", a less favorable evaluation of Ms. La Liberte in a lawsuit defendant is trying to prove that Ms. La Liberte is a racist. In these

---

[1] Prior to my involvement, Mr. Mysliwiec had contacted Mr. Eisner directly, and thereafter corresponded with Fox 11's in-house attorney about plaintiff's desire to depose Mr. Eisner. Fox 11's attorney advised plaintiff's counsel that Mr. Eisner would invoke the reporter's privilege in response to a subpoena. During that process, Mr. Mysliwiec had provided them with a list of 8 lines of questions he intended to pose to Mr. Eisner as his deposition. A true and correct copy of Mr. Mysliwiec's list of questions is attached hereto as <u>Exhibit 4</u>.

2

circumstances it is not only the exact words that matter, but how Ms. La Liberte spoke to someone whom defendant has described in her deposition as a 'child.'" A true and correct copy of Mr. Mysliwiec's September 1st email to me is attached hereto as Exhibit 6.

8.      I responded to Mr. Mysliwiec's September 1st email on September 2, 2021, explaining that I disagreed that the "authentication" question he wanted to ask Mr. Eisner was still outside the scope of the reporter's privilege and shield laws because it implicitly seeks testimony about unpublished information and would subject Mr. Eisner to cross-examination about unpublished information. My September 2nd email also requested copies of the deposition transcripts for Joseph Luevanos and his mother, Ruth Luevanos, so that I could better assess the putative relevance of the testimony plaintiff sought from Mr. Eisner. A true and correct copy of my September 2nd email to Mr. Mysliwiec is attached hereto as Exhibit 7.

9.      On September 3, 2021, Mr. Mysliwiec responded to my September 2nd email with a question: "Before I respond to you, please answer one question for me. Do any outtakes from Mr. Eisner's interviews on June 29, 2018 still exist?" A true and correct copy of Mr. Mysliwiec's September 1st email to me is attached hereto as Exhibit 8.

10.     On September 9, 2021, I responded to Mr. Mysliwiec's September 3rd email, explaining that "we do not have any unpublished footage (or notes) concerning Hal's reporting about the Simi Valley City Council meeting, the Ventura County Star photo, and their aftermath (as previously discussed, he was *not* at the meeting itself and has no firsthand knowledge of what transpired at the meeting" and followed up on my request for the Luevanos' deposition transcripts. A true and correct copy of my September 2nd email to Mr. Mysliwiec is attached hereto as Exhibit 9.

11.     On September 10, 2021, Mr. Mysliwiec emailed me. In that email, Mr. Mysliwiec reiterated that he had "reduced my questions to a single line of inquiry. I just want Mr. Eisner to authenticate his interviews of Ms. Liberte and Joseph Luevanos as

3

fair, accurate and correct pursuant to FRE 901. Such inquiry would not require Mr. Eisner to reveal any sources or unpublished materials relating to those interviews, the subjects of the journalistic shields laws upon which Mr. Eisner purported to rely. I advised you that the law upon which you relied did not result in a waiver by Mr. Eisner of any journalistic shield law, if he were subject to cross-examination, and urged you to research the topic yourself. Apparently you have done so." Mr. Mysliwiec then stated that "The final nail in the journalistic-shield-law coffin is the fact that your client is in possession of no unpublished materials relating to the interviews in question. Thus, he could not, in good faith, rely on the journalistic shield laws, if there were no unpublished materials to produce." Mr. Mysliwiec concluded by stating that further meet-and-confer efforts would be "hopeless" and that plaintiff would therefore "begin the process under LR 37 to compel Mr. Eisner's deposition as soon as we can next week" unless I provided him with a deposition date for Mr. Eisner. A true and correct copy of Mr. Mysliwiec's September 1st email to me is attached hereto as <u>Exhibit 10</u>.

12.   I immediately called Mr. Mysliwiec after receiving his September 10th email, took issue with the personal attacks contained therein, and explained that Mr. Eisner would not voluntarily sit for the deposition, so if plaintiff still wished to pursue his deposition, we appeared to be at a stalemate that would require motion practice.

13.   Separately, that same day (September 10th) Mr. Mysliwiec emailed me the "minuscripts" from the Luevanos' depositions. The email contained no text from Mr. Mysliwiec. Relevant pages from the minuscript that Mr. Mysliwiec provided me are attached hereto as <u>Exhibit 11</u>, with the cited testimony underlined.

14.   Plaintiff's local counsel emailed plaintiff's portion of the joint stipulation on September 21, 2021.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  September 27, 2021

*Joel M. Tantalo*
_____
**JOEL M. TANTALO**

DECLARATION OF JOEL M. TANTALO IN SUPPORT OF NON-PARTY HAROLD EISNER'S OPPOSITION
TO PLAINTIFF'S MOTION TO COMPEL COMPLIANCE WITH DEPOSITION SUBPOENA

# EXHIBIT 1

EXHIBIT 1
Page 5

| From: | Joel Tantalo |
|---|---|
| To: | Ronald P. Mysliwiec Esq. (rpm@rpmlawny.com) |
| Cc: | Scott O. Luskin, Esq. (sol@paynefears.com); Joel Tantalo |
| Subject: | RE: La Liberte v. Eisner |
| Date: | Monday, August 2, 2021 10:55:16 AM |

Mr. Mysliwiec,

We have been engaged to represent Mr Eisner in connection with your subpoena.  Please direct all further communications to me.  I need a little time to get up to speed on this matter, but I should be able to talk on Wednesday.  Please let me know when you are available.

In the meantime, I would not be available for a deposition on August 18th in any event, so even if we can sort out the substantive issues concerning the subpoena, we would need to select a different date.  I think you can safely tell your opposing counsel that Mr. Eisner's deposition will not be proceeding on August 18th.

I look forward to speaking with you, and hopefully sorting this all out.

--joel

Joel M. Tantalo
**TANTALO & ADLER LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Main:    (310) 734-8695
Direct:  (310) 734-8693
Email:   jtantalo@ta-llp.com

---

**From:** rpm@rpmlawny.com <rpm@rpmlawny.com>
**Sent:** Monday, August 2, 2021 9:39:36 AM
**To:** Rafferty, Lisa <Lisa.Rafferty@FOX.COM>
**Cc:** 'Scott O. Luskin' <SOL@paynefears.com>
**Subject:** RE: La Liberte v. Eisner

Lisa:

          Where do you and your employer stand on Mr. Eisner's deposition? I will be leaving for vacation early on Friday, August 6 and won't be returning until the weekend of August 14 – 15. I am deposing the defendant in this case on Monday, August 15. My opponents need to know whether there will be a deposition of Mr. Eisner as scheduled before I go on vacation later this week.

RPM

---

**From:** Rafferty, Lisa <Lisa.Rafferty@FOX.COM>
**Sent:** Tuesday, July 27, 2021 8:08 PM
**To:** rpm@rpmlawny.com
**Cc:** 'Scott O. Luskin' <SOL@paynefears.com>
**Subject:** RE: La Liberte v. Eisner

Hello, yes I am aware, we are engaging outside counsel and I'm sure you will hear from him within a

EXHIBIT 1
Page 6

# EXHIBIT
# 2

EXHIBIT 2
Page 7

| From: | Joel Tantalo |
|---|---|
| To: | Ronald P. Mysliwiec Esq. (rpm@rpmlawny.com) |
| Cc: | Scott O. Luskin, Esq. (sol@paynefears.com); John H. Reichman Esq. (john@johnreichmanlaw.com); David Yeger Esq. (david@yegeresq.com); Marcellus A. McRae Esq. (MMcRae@gibsondunn.com); Marissa M. Mulligan Esq. (mmulligan@gibsondunn.com); Theodore J. Boutrous Esq. (tboutrous@gibsondunn.com); Joel Tantalo |
| Subject: | La Liberte v Reid | EDNY Case #1:18-CV-05398 |
| Date: | Thursday, August 5, 2021 3:27:18 PM |
| Attachments: | 2021-08-05 Eisner Objections and M&C.pdf |

Mr. Mysliwiec (and counsel),

Please see the attached correspondence in the above-referenced matter concerning plaintiff's subpoena to Harold Eisner.

--joel

Joel M. Tantalo
**TANTALO & ADLER LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Main:    (310) 734-8695
Direct:  (310) 734-8693
Email:   jtantalo@ta-llp.com

EXHIBIT 2
Page 8

 

Our File No. 30667-056

Joel M. Tantalo
Direct: (310) 734-8693
E-mail: jtantalo@ta-llp.com

**VIA E-MAIL & U.S. MAIL**
August 5, 2021

Ronald P. Mysliwiec, Esq.
**Law Offices of Ronald P. Mysliwiec**
530 Third St.
Brooklyn, NY 11215
email: rpm@rpmlawny.com

   Re: *La Liberte v. Reid*
     USDC EDNY Case NO. 1:18-CV-05398

Mr. Mysliwiec:

As noted in my email to you on Monday, August 2nd, we have been retained to represent Hal Eisner in connection with a subpoena commanding Mr. Eisner to sit for a deposition on August 18, 2021. I invited a call to discuss the matter but never heard back from you.

As I explained in my email, I am not available to represent Mr. Eisner at a deposition on August 18th.

More fundamentally, though, I have reviewed your proposed deposition questions and there does not appear to be any basis justifying a deposition of Mr. Eisner in this case – certainly not at this time – and hence this letter constitutes Mr. Eisner's objections to the subpoena and, to the extent you wish to pursue this matter further by motion practice, an invitation to meet-and-confer concerning the issues pursuant to Central District Local Rule 45-1, incorporating Local Rule 37.

The deposition subpoena is subject to being quashed under FRCP 45(d)(3)(A)(iii) and (B)(1) because it seeks information from a journalist that is privileged or confidential pursuant to the federal common law reporter's privilege and the California shield law. Furthermore, given those privileges and protections, the deposition subpoena would impose an undue burden on Mr. Eisner, and hence is also subject to being quashed under FRCP 45(b)(3)(A)(iv).

**THE FEDERAL REPORTER'S PRIVILEGE**

The federal reporter's privilege is rooted in the First Amendment to the United States Constitution. "When facts acquired by a journalist in the course of gathering the news become the target of discovery, a qualified privilege against compelled disclosure comes into play." *Shoen v. Shoen*, 5 F.3d 1289, 1292 (1993) ("*Shoen I*"). Because the subpoena seeks testimony concerning "facts acquired by a journalist in the course of gathering the news", the federal reporter's privilege necessarily is implicated.

---

1801 Century Park East, Suite 2400, Los Angeles, CA 90067 • Telephone: 310.734.8695 • Facsimile: 310.734.8696 • www.ta-llp.com

EXHIBIT 2
Page 9



TANTALO & ADLER LLP

August 5, 2021
Page 2

As the Ninth Circuit explained in *Shoen I*, the qualified privilege is a "partial First Amendment shield that protects journalists against compelled disclosure in all judicial proceedings, civil and criminal alike … [T]he privilege is a recognition that society's interest in protecting the integrity of the newsgathering process, and in ensuring the free flow of information to the public, is an interest of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice." *Id.* (internal quotations and citation omitted).

Thus, a subpoenaing party must "demonstrate a sufficiently compelling need for the journalist's materials to overcome the privilege. *At a minimum, this requires a showing that the information sought is not obtainable from another source. In other words, before disclosure may be ordered, the requesting party must demonstrate that she has exhausted all reasonable alternative means for obtaining the information.*" *Id.* at 1296 (emphasis added; internal quotations and citations omitted).

In a subsequent appeal in the same case, the Ninth Circuit later explained that "*in the ordinary case the civil litigant's interest in disclosure should yield to the journalist's privilege.* Indeed, if the privilege does not prevail in all but the most exceptional cases, its value will be substantially diminished." *Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995) ("*Shoen II*") (quoting *Zerilli v. Smith*, 656 F.2d 705, 712 (D.C. Cir. 1981) (emphasis added).

In *Shoen II*, the Ninth Circuit laid out the requirements for overcoming the qualified privilege when seeking non-confidential information from a non-party journalist in a civil case:[1]

> [W]here information sought is not confidential, a civil litigant is entitled to requested discovery notwithstanding a valid assertion of the journalist's privilege by a nonparty only upon a showing that the requested material is: (1) unavailable despite exhaustion of all reasonable alternative sources; (2) noncumulative; and (3) clearly relevant to an important issue in the case. We note that there must be a showing of actual relevance; a showing of potential relevance will not suffice.

*Shoen II*, 48 F.3d at 416 (emphasis added); *see also Michael v. Est. of Kovarbasich*, No. 15-00275-MWF, 2015 WL 8750643, at *4 (C.D. Cal. Dec. 11, 2015).

Plaintiff cannot satisfy the *Shoen II* test.

First, it appears that the parties in this action have not yet engaged in party depositions, much less non-journalistic, non-party percipient witnesses to the events about which you intend to inquire. Under *Shoen I*, that alone would justify quashing the subpoena. *Shoen I*, 5 F.3d at 1292 ("[B]efore disclosure may be ordered, the requesting party must demonstrate that she has exhausted all reasonable alternative means for obtaining the information."); *see also Michael*, 2015 WL 8750643 at *4 (plaintiff cannot possibly satisfy the test if it has not yet deposed the subject of the reporting).

---

[1] The qualified privilege is even stronger for confidential sources and information.

EXHIBIT 2
Page 10



**TANTALO & ADLER LLP**

August 5, 2021
Page 3

Second, regardless, the information you seek would be cumulative – most of your proposed questions necessarily involve multiple other percipient witnesses and hence, by definition, would be duplicative of discovery from them.

And third, in any event, the proposed questions are far from "clearly relevant to an important issue in the case." Indeed, none of them go to the elements of (or defenses to) plaintiff's lone claim for defamation against defendant.

Plaintiff could not satisfy any of the *Shoen II* factors, much less all of them.

**THE CALIFORNIA SHIELD LAW**

In addition to the federal reporter's privilege, the California shield law also applies to the subpoena. The free speech provisions of the California Constitution expressly provide that a journalist "shall not be adjudged in contempt … for refusing to disclose the source of any information procured … or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public." Cal. Const., Art I, § 2 (b). The California statute on which the constitutional amendment is based, entitled "Newsmen's Privilege – Unpublished Information" is nearly identical. Cal. Evid. Code § 1070.

The California Supreme Court has held that in the civil context, the California shield law is not a qualified privilege but rather an "***absolute immunity***" for non-party journalists – and hence "the shield law's protection can[not] be overcome in a civil action by a litigant's showing of need for the newsperson's unpublished information." *New York Times Co. v. Superior Ct.*, 51 Cal. 3d 453, 456 (1990) (distinguishing between party and non-party journalists).

Nearly all your proposed deposition questions seek unpublished newsgathering information, and those that do not seek such information are either irrelevant, can be obtained from alternative, non-journalistic sources, or both.

Given that Mr. Eisner is entitled to "absolute immunity" with respect to his unpublished newsgathering information, the California shield law would also justify quashing the subpoena. *New York Times*, 51 Cal. 3d at 456.

**CONCLUSION**

In light of the foregoing, I propose that we hold the subpoena in abeyance for now, while you first engage in party and non-journalistic non-party percipient witness discovery. Then, if you still believe it is necessary to take Mr. Eisner's deposition, we can revisit whether plaintiff has a basis to do so considering the qualified federal reporter's privilege and the unqualified California shield law immunity applicable to Mr. Eisner.

Alternatively, if you are not amenable to that proposed solution, we can proceed with the mandatory meet-and-confer process in advance of motion practice. If so, I understand that you are

EXHIBIT 2
Page 11



August 5, 2021
Page 4

about to leave on a vacation – I am as well. But please let me know when you are available to discuss the issues upon your return the week of August 16th (I return to the office on August 17th).

Sincerely yours,

*Joel M. Tantalo*

Joel M. Tantalo

cc (via email):      Scott O. Luskin, Esq.
                     John H. Reichman, Esq.
                     David Yeger, Esq.
                     Marcellus A. McRae, Esq.
                     Marissa Moshell, Esq.
                     Theodore J. Boutrous, Jr., Esq.

EXHIBIT 2
Page 12

# EXHIBIT 3

EXHIBIT 3
Page 13

| From: | rpm@rpmlawny.com |
| --- | --- |
| To: | Joel Tantalo |
| Cc: | "David Olasov" |
| Subject: | RE: La Liberte v Reid | EDNY Case #1:18-CV-05398 |
| Date: | Monday, August 23, 2021 11:52:04 AM |

Joel:

      When will it be convenient to speak about the deposition of Hal Eisner?

RPM

**From:** Joel Tantalo <jtantalo@ta-llp.com>
**Sent:** Thursday, August 5, 2021 6:27 PM
**To:** Ronald P. Mysliwiec Esq. (rpm@rpmlawny.com) <rpm@rpmlawny.com>
**Cc:** Scott O. Luskin, Esq. (sol@paynefears.com) <sol@paynefears.com>; John H. Reichman Esq. (john@johnreichmanlaw.com) <john@johnreichmanlaw.com>; David Yeger Esq. (david@yegeresq.com) <david@yegeresq.com>; Marcellus A. McRae Esq. (MMcRae@gibsondunn.com) <mmcrae@gibsondunn.com>; Marissa M. Mulligan Esq. (mmulligan@gibsondunn.com) <mmulligan@gibsondunn.com>; Theodore J. Boutrous Esq. (tboutrous@gibsondunn.com) <tboutrous@gibsondunn.com>; Joel Tantalo <jtantalo@ta-llp.com>
**Subject:** La Liberte v Reid | EDNY Case #1:18-CV-05398

Mr. Mysliwiec (and counsel),

Please see the attached correspondence in the above-referenced matter concerning plaintiff's subpoena to Harold Eisner.

--joel

Joel M. Tantalo
**TANTALO & ADLER LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Main:   (310) 734-8695
Direct: (310) 734-8693
Email:  jtantalo@ta-llp.com

EXHIBIT 3
Page 14

# EXHIBIT
# 4

EXHIBIT 4
Page 15

## HAL EISNER DEPOSITION QUESTIONS

1. Are you currently employed by Fox Television, Channel 11 in Los Angeles, CA? Were you so employed in June 2018? What was your job function at that time?

2. As part of your job as a television journalist for Channel 11 in June 2018, did you have occasion to interview Joseph Luevanos and Roslyn La Liberte in connection with a Simi Valley Town Council meeting held on June 25, 2018, relating to what was then referred to as SB 54?

3. Were you at the meeting?  How did the names of Mr. Luevanos and Ms. La Liberte come to your attention? How did you find out where they lived?

4. How did you initially contact Joseph? Did you talk to his mother first? Did you ask any adult family member's permission to talk to Joseph? How did you identify yourself? Did you tell them that Channel 11 was a FOX television channel?

5. Were the videotapes of your interviews played on air on Channel 11 in Los Angeles on or about June 29, 2018? [Play television report video.] Where did you interview Joseph? In front of some local government building in Simi Valley? Who chose the public venue for the interview? Did a family member or anyone else, accompany Joseph to the interview? Did you discuss the questions with Joseph before the taping of the interview began? Did Joseph or anyone with him object to anything after the taping was done?

6. There has been an allegation that you or someone else "pressured" Joseph into giving you that interview, is there any truth to that accusation?

7. Do these videotapes fairly and accurately depict the interviews you conducted with Mr. Luevanos and Ms. La Liberte between June 25, 2018 and June 29, 2018? Did you watch this broadcast when it originally aired on Channel 11 on June 29, 2018? Does this videotape fairly and accurately depict that broadcast?

8. Did you receive any threats after the interviews were aired on June 29, 2018? Any complaints? From Joseph's family? Others?

EXHIBIT 4
Page 16

# EXHIBIT
# 5

EXHIBIT 5
Page 17

| From: | rpm@rpmlawny.com |
|---|---|
| **To:** | Joel Tantalo |
| **Cc:** | "Scott O. Luskin"; "David Olasov" |
| **Subject:** | Hal Eisner |
| **Date:** | Wednesday, September 1, 2021 7:24:29 AM |

Joel:

     I write for two reasons.

     First, this is to memorialize our telephone conversation on Monday, August 30, that my client seeks neither sources nor unpublished material from Mr. Eisner at his deposition. It simply needs him to authenticate his interviews of Mr. Luevanos and Ms. La Liberte as broadcast on Channel 11 on June 29, 2018, as fair, accurate and correct representations of those interviews.

     I know that you were hopeful that such limited testimony could be in the form of a stipulation between the parties, but we don't share your optimism.

     We are under time constraints to complete discovery in our case and need to know whether we have to make a motion to compel in LA.

     Please advise.

RPM

EXHIBIT 5
Page 18

# EXHIBIT 6

EXHIBIT 6
Page 19

| | |
|---|---|
| **From:** | rpm@rpmlawny.com |
| **To:** | Joel Tantalo |
| **Cc:** | "David Olasov"; "Scott O. Luskin" |
| **Subject:** | Hal Eisner |
| **Date:** | Wednesday, September 1, 2021 1:46:28 PM |

Joel:

    As I told you on the telephone earlier today, since we are seeking neither Mr. Eisner's sources nor any unpublished materials relating to his June 29, 2018 interviews of Ms. La Liberte and Mr. Luevanos, are subpoena to Mr. Eisner is not barred by either the U.S. Constitution, the CA Constitution or the CA Rules of evidence. Moreover, for the same reason, no "balancing test" or other, heightened requirement is applied here. Only FRCP Rule 26 controls. The information sought must merely be *relevant* to any party's claim or defense. Rule 26 says *relevant*, not dispositive.

    It is my best information that both Joseph Luevanos and his mother, Ruth, have testified at their depositions that Mr. Eisner or Channel 11 cut parts of the interview before it was aired. In the interview and in the broadcast thereof, Joseph says that Ms. La Liberte was civil to him at all times. At their depositions both mother and son said that during the interview Joseph said that Ms. La Liberte was "civil compared to others", a less favorable evaluation of Ms. La Liberte in a lawsuit defendant is trying to prove that Ms. La Liberte is a racist. In these circumstances it is not only the exact words that matter, but how Ms. La Liberte spoke to someone whom defendant has described in her deposition as a "child".

RPM

EXHIBIT 6
Page 20

# EXHIBIT
# 7

EXHIBIT 7
Page 21

| From: | Joel Tantalo |
|---|---|
| To: | rpm@rpmlawny.com |
| Cc: | "David Olasov"; "Scott O. Luskin"; Joel Tantalo |
| Subject: | RE: Hal Eisner |
| Date: | Thursday, September 2, 2021 10:48:13 PM |

Thanks, Ron (and sorry about calling you "Ray" when we got off the phone yesterday).  I disagree that your questions render the federal and state shield laws inapplicable.

First, the questions you want to ask Hal about whether the published reporting was a "fair and accurate depiction" of his interview with Joseph Luevanos implicitly would implicate his sources and unpublished materials because those questions really ask whether the unpublished materials are consistent with the published reporting.  Also, answering those questions could also open the door to cross-examination about his sources and unpublished materials.

Second, the purpose and public policy underlying both the federal and state shield laws is to protect journalists from the chilling effect that necessarily results from routine discovery into their newsgathering and reporting efforts.  That is why the federal qualified privilege has such a high bar, and why the state protection is unqualified.

That said, I would still like to pursue the relevance issue to its natural conclusion, in hopes that we can find a solution that avoids the need for court intervention.  Since, as I understand it, the basis for the questions you would like to ask Hal relate directly to the testimony that Ruth and Joseph Luevanos apparently provided at their recent depositions, can you please provide me with copies of their deposition transcripts?  As a non-party to this litigation, we lack the facts and context that are necessary to assess the relevance issue – whether under the shield laws or Rule 26.

Finally, I am still waiting to hear back from Gibson Dunn about the prospect of a stipulation that would avoid the issue altogether. I called Marissa Mulligan after you and I spoke yesterday, but she was about to join a deposition and couldn't talk at the time.  I will let you know when I hear back from her.

I will be out of pocket tomorrow.  But let's talk on Tuesday or, if you are celebrating Rosh Hashanah, when you are back in the office.

--joel

PS:  I'm from NY originally, and have lots of family and friends out there.  The stories I'm hearing are horrifying.  I hope everyone and everything is OK for you and your family.

Joel M. Tantalo
**TANTALO & ADLER LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Main:    (310) 734-8695
Direct:  (310) 734-8693
Email:   jtantalo@ta-llp.com

---

**From:** rpm@rpmlawny.com <rpm@rpmlawny.com>
**Sent:** Wednesday, September 1, 2021 1:46 PM
**To:** Joel Tantalo <jtantalo@ta-llp.com>
**Cc:** 'David Olasov' <dolasov@olasov.com>; 'Scott O. Luskin' <SOL@paynefears.com>
**Subject:** Hal Eisner

Joel:

        As I told you on the telephone earlier today, since we are seeking neither Mr. Eisner's

EXHIBIT 7
Page 22

sources nor any unpublished materials relating to his June 29, 2018 interviews of Ms. La Liberte and Mr. Luevanos, are subpoena to Mr. Eisner is not barred by either the U.S. Constitution, the CA Constitution or the CA Rules of evidence. Moreover, for the same reason, no "balancing test" or other, heightened requirement is applied here. Only FRCP Rule 26 controls. The information sought must merely be *relevant* to any party's claim or defense. Rule 26 says *relevant*, not dispositive.

It is my best information that both Joseph Luevanos and his mother, Ruth, have testified at their depositions that Mr. Eisner or Channel 11 cut parts of the interview before it was aired. In the interview and in the broadcast thereof, Joseph says that Ms. La Liberte was civil to him at all times. At their depositions both mother and son said that during the interview Joseph said that Ms. La Liberte was "civil compared to others", a less favorable evaluation of Ms. La Liberte in a lawsuit defendant is trying to prove that Ms. La Liberte is a racist. In these circumstances it is not only the exact words that matter, but how Ms. La Liberte spoke to someone whom defendant has described in her deposition as a "child".

RPM

EXHIBIT 7
Page 23

# EXHIBIT 8

EXHIBIT 8
Page 24

| From: | rpm@rpmlawny.com |
|---|---|
| To: | Joel Tantalo |
| Cc: | "David Olasov"; "Scott O. Luskin" |
| Subject: | RE: Hal Eisner |
| Date: | Friday, September 3, 2021 7:09:00 AM |

Joel:

    Before I respond to you, please answer one question for me. Do any outtakes from Mr. Eisner's interviews on June 29, 2018 still exist?

RPM

**From:** Joel Tantalo <jtantalo@ta-llp.com>
**Sent:** Friday, September 3, 2021 1:48 AM
**To:** rpm@rpmlawny.com
**Cc:** 'David Olasov' <dolasov@olasov.com>; 'Scott O. Luskin' <SOL@paynefears.com>; Joel Tantalo <jtantalo@ta-llp.com>
**Subject:** RE: Hal Eisner

Thanks, Ron (and sorry about calling you "Ray" when we got off the phone yesterday).  I disagree that your questions render the federal and state shield laws inapplicable.

First, the questions you want to ask Hal about whether the published reporting was a "fair and accurate depiction" of his interview with Joseph Luevanos implicitly would implicate his sources and unpublished materials because those questions really ask whether the unpublished materials are consistent with the published reporting.  Also, answering those questions could also open the door to cross-examination about his sources and unpublished materials.

Second, the purpose and public policy underlying both the federal and state shield laws is to protect journalists from the chilling effect that necessarily results from routine discovery into their newsgathering and reporting efforts.  That is why the federal qualified privilege has such a high bar, and why the state protection is unqualified.

That said, I would still like to pursue the relevance issue to its natural conclusion, in hopes that we can find a solution that avoids the need for court intervention.  Since, as I understand it, the basis for the questions you would like to ask Hal relate directly to the testimony that Ruth and Joseph Luevanos apparently provided at their recent depositions, can you please provide me with copies of their deposition transcripts?  As a non-party to this litigation, we lack the facts and context that are necessary to assess the relevance issue – whether under the shield laws or Rule 26.

Finally, I am still waiting to hear back from Gibson Dunn about the prospect of a stipulation that would avoid the issue altogether. I called Marissa Mulligan after you and I spoke yesterday, but she was about to join a deposition and couldn't talk at the time.  I will let you know when I hear back from her.

I will be out of pocket tomorrow.  But let's talk on Tuesday or, if you are celebrating Rosh Hashanah, when you are back in the office.

--joel

PS:  I'm from NY originally, and have lots of family and friends out there.  The stories I'm hearing are horrifying.  I hope everyone and everything is OK for you and your family.

Joel M. Tantalo
**TANTALO & ADLER LLP**

EXHIBIT 8
Page 25

1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Main:     (310) 734-8695
Direct:   (310) 734-8693
Email:    jtantalo@ta-llp.com

---

**From:** rpm@rpmlawny.com <rpm@rpmlawny.com>
**Sent:** Wednesday, September 1, 2021 1:46 PM
**To:** Joel Tantalo <jtantalo@ta-llp.com>
**Cc:** 'David Olasov' <dolasov@olasov.com>; 'Scott O. Luskin' <SOL@paynefears.com>
**Subject:** Hal Eisner

Joel:

As I told you on the telephone earlier today, since we are seeking neither Mr. Eisner's sources nor any unpublished materials relating to his June 29, 2018 interviews of Ms. La Liberte and Mr. Luevanos, are subpoena to Mr. Eisner is not barred by either the U.S. Constitution, the CA Constitution or the CA Rules of evidence. Moreover, for the same reason, no "balancing test" or other, heightened requirement is applied here. Only FRCP Rule 26 controls. The information sought must merely be *relevant* to any party's claim or defense. Rule 26 says *relevant*, not dispositive.

It is my best information that both Joseph Luevanos and his mother, Ruth, have testified at their depositions that Mr. Eisner or Channel 11 cut parts of the interview before it was aired. In the interview and in the broadcast thereof, Joseph says that Ms. La Liberte was civil to him at all times. At their depositions both mother and son said that during the interview Joseph said that Ms. La Liberte was "civil compared to others", a less favorable evaluation of Ms. La Liberte in a lawsuit defendant is trying to prove that Ms. La Liberte is a racist. In these circumstances it is not only the exact words that matter, but how Ms. La Liberte spoke to someone whom defendant has described in her deposition as a "child".

RPM

EXHIBIT 8
Page 26

# EXHIBIT 9

EXHIBIT 9
Page 27

| From: | Joel Tantalo |
|---|---|
| To: | rpm@rpmlawny.com |
| Cc: | "David Olasov"; "Scott O. Luskin"; Joel Tantalo |
| Subject: | RE: Hal Eisner |
| Date: | Thursday, September 9, 2021 9:04:35 AM |

Ron,

I can confirm that we do not have any unpublished footage (or notes) concerning Hal's reporting about the Simi Valley City Council meeting, the Ventura County Star photo, and their aftermath (as previously discussed, he was \***not**\* at the meeting itself and has no firsthand knowledge of what transpired at the meeting).  Per your email last week, can you please send the deposition transcripts so I can review and continue our discussion about the requested deposition – and, hopefully, avoid the need for motion practice?

Thanks in advance.

--joel

Joel M. Tantalo
**TANTALO & ADLER LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Main:    (310) 734-8695
Direct:  (310) 734-8693
Email:   jtantalo@ta-llp.com

---

**From:** Joel Tantalo <jtantalo@ta-llp.com>
**Sent:** Wednesday, September 8, 2021 12:29 PM
**To:** rpm@rpmlawny.com
**Cc:** 'David Olasov' <dolasov@olasov.com>; 'Scott O. Luskin' <SOL@paynefears.com>; Joel Tantalo <jtantalo@ta-llp.com>
**Subject:** RE: Hal Eisner

Ron,

My client contact at Fox didn't know offhand the answer to your question about unbroadcast footage, but she is looking into it.  I should know by tomorrow morning (my time), if not sooner.

--joel

Joel M. Tantalo
**TANTALO & ADLER LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Main:    (310) 734-8695
Direct:  (310) 734-8693
Email:   jtantalo@ta-llp.com

---

**From:** Joel Tantalo <jtantalo@ta-llp.com>
**Sent:** Tuesday, September 7, 2021 9:46 AM
**To:** rpm@rpmlawny.com
**Cc:** 'David Olasov' <dolasov@olasov.com>; 'Scott O. Luskin' <SOL@paynefears.com>; Joel Tantalo <jtantalo@ta-llp.com>
**Subject:** RE: Hal Eisner

EXHIBIT 9
Page 28

Ron,

Quick update: my client contact at Fox is out of the office until tomorrow.  I'll call you after I speak with her.

--joel

Joel M. Tantalo
**TANTALO & ADLER LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Main:    (310) 734-8695
Direct:  (310) 734-8693
Email:   jtantalo@ta-llp.com

**From:** rpm@rpmlawny.com <rpm@rpmlawny.com>
**Sent:** Friday, September 3, 2021 7:09 AM
**To:** Joel Tantalo <jtantalo@ta-llp.com>
**Cc:** 'David Olasov' <dolasov@olasov.com>; 'Scott O. Luskin' <SOL@paynefears.com>
**Subject:** RE: Hal Eisner

Joel:

        Before I respond to you, please answer one question for me. Do any outtakes from Mr. Eisner's interviews on June 29, 2018 still exist?

RPM

**From:** Joel Tantalo <jtantalo@ta-llp.com>
**Sent:** Friday, September 3, 2021 1:48 AM
**To:** rpm@rpmlawny.com
**Cc:** 'David Olasov' <dolasov@olasov.com>; 'Scott O. Luskin' <SOL@paynefears.com>; Joel Tantalo <jtantalo@ta-llp.com>
**Subject:** RE: Hal Eisner

Thanks, Ron (and sorry about calling you "Ray" when we got off the phone yesterday).  I disagree that your questions render the federal and state shield laws inapplicable.

First, the questions you want to ask Hal about whether the published reporting was a "fair and accurate depiction" of his interview with Joseph Luevanos implicitly would implicate his sources and unpublished materials because those questions really ask whether the unpublished materials are consistent with the published reporting.  Also, answering those questions could also open the door to cross-examination about his sources and unpublished materials.

Second, the purpose and public policy underlying both the federal and state shield laws is to protect journalists from the chilling effect that necessarily results from routine discovery into their newsgathering and reporting efforts.  That is why the federal qualified privilege has such a high bar, and why the state protection is unqualified.

That said, I would still like to pursue the relevance issue to its natural conclusion, in hopes that we can find a solution that avoids the need for court intervention.  Since, as I understand it, the basis for the questions you would like to ask Hal relate directly to the testimony that Ruth and Joseph Luevanos

EXHIBIT 9
Page 29

apparently provided at their recent depositions, can you please provide me with copies of their deposition transcripts?  As a non-party to this litigation, we lack the facts and context that are necessary to assess the relevance issue – whether under the shield laws or Rule 26.

Finally, I am still waiting to hear back from Gibson Dunn about the prospect of a stipulation that would avoid the issue altogether. I called Marissa Mulligan after you and I spoke yesterday, but she was about to join a deposition and couldn't talk at the time.  I will let you know when I hear back from her.

I will be out of pocket tomorrow.  But let's talk on Tuesday or, if you are celebrating Rosh Hashanah, when you are back in the office.

--joel

PS:  I'm from NY originally, and have lots of family and friends out there.  The stories I'm hearing are horrifying.  I hope everyone and everything is OK for you and your family.

Joel M. Tantalo
**TANTALO & ADLER LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Main:     (310) 734-8695
Direct:   (310) 734-8693
Email:    jtantalo@ta-llp.com

---

**From:** rpm@rpmlawny.com <rpm@rpmlawny.com>
**Sent:** Wednesday, September 1, 2021 1:46 PM
**To:** Joel Tantalo <jtantalo@ta-llp.com>
**Cc:** 'David Olasov' <dolasov@olasov.com>; 'Scott O. Luskin' <SOL@paynefears.com>
**Subject:** Hal Eisner

Joel:

        As I told you on the telephone earlier today, since we are seeking neither Mr. Eisner's sources nor any unpublished materials relating to his June 29, 2018 interviews of Ms. La Liberte and Mr. Luevanos, are subpoena to Mr. Eisner is not barred by either the U.S. Constitution, the CA Constitution or the CA Rules of evidence. Moreover, for the same reason, no "balancing test" or other, heightened requirement is applied here. Only FRCP Rule 26 controls. The information sought must merely be *relevant* to any party's claim or defense. Rule 26 says *relevant*, not dispositive.

        It is my best information that both Joseph Luevanos and his mother, Ruth, have testified at their depositions that Mr. Eisner or Channel 11 cut parts of the interview before it was aired. In the interview and in the broadcast thereof, Joseph says that Ms. La Liberte was civil to him at all times. At their depositions both mother and son said that during the interview Joseph said that Ms. La Liberte was "civil compared to others", a less favorable evaluation of Ms. La Liberte in a lawsuit defendant is trying to prove that Ms. La Liberte is a racist. In these circumstances it is not only the exact words that matter, but how Ms. La Liberte spoke to someone whom defendant has described in her deposition as a "child".

RPM

EXHIBIT 9
Page 30

# EXHIBIT 10

EXHIBIT 10
Page 31

| From: | rpm@rpmlawny.com |
|---|---|
| To: | Joel Tantalo |
| Cc: | "David Olasov"; "Scott O. Luskin" |
| Subject: | RE: Hal Eisner |
| Date: | Friday, September 10, 2021 11:10:06 AM |

Joel:

It has now been more than two months since I had my conversation with Mr. Eisner about his deposition testimony in this case. On July 3 I emailed to Mr. Eisner a page of potential questions I might ask him at that deposition. On July 6 I received an email from Lisa Rafferty, Esq. telling me that she was representing Mr. Eisner. She told me that Mr. Eisner did not wish to testify. On July 12 she sent me another email, telling me that if I succeeded in serving a subpoena on Mr. Eisner, a motion to quash would be made on his behalf.

On July 23 I successfully served Mr. Eisner with his subpoena on my fifth attempt.

On August 2, 2021, you announced your appearance on Mr. Eisner's behalf. On August 5 you sent me a lengthy letter, copied to no less than five lawyers representing defendant Reid, telling me how Mr. Eisner was the beneficiary of federal and state journalistic shield laws. I reduced my questions to a single line of inquiry. I just want Mr. Eisner to authenticate his interviews of Ms. Liberte and Joseph Luevanos as fair, accurate and correct pursuant to FRE 901. Such inquiry would not require Mr. Eisner to reveal any sources or unpublished materials relating to those interviews, the subjects of the journalistic shields laws upon which Mr. Eisner purported to rely. I advised you that the law upon which you relied did not result in a waiver by Mr. Eisner of any journalistic shield law, if he were subject to cross-examination, and urged you to research the topic yourself. Apparently you have done so.

The final nail in the journalistic-shield-law coffin is the fact that your client is in possession of no unpublished materials relating to the interviews in question. Thus, he could not, in good faith, rely on the journalistic shield laws, if there were no unpublished materials to produce.

The fact that you, nonetheless, want to stretch out this process even further tells me that any attempt to reach agreement with Mr. Eisner is hopeless. We will begin the process under LR 37 to compel Mr. Eisner's deposition as soon as we can next week. Either give me a date for Mr. Eisner's deposition or be prepared for our LR 37 Stipulation next week.

RPM

**From:** Joel Tantalo <jtantalo@ta-llp.com>
**Sent:** Thursday, September 9, 2021 12:05 PM
**To:** rpm@rpmlawny.com
**Cc:** 'David Olasov' <dolasov@olasov.com>; 'Scott O. Luskin' <SOL@paynefears.com>; Joel Tantalo <jtantalo@ta-llp.com>

EXHIBIT 10
Page 32

**Subject:** RE: Hal Eisner

Ron,

I can confirm that we do not have any unpublished footage (or notes) concerning Hal's reporting about the Simi Valley City Council meeting, the Ventura County Star photo, and their aftermath (as previously discussed, he was \***not**\* at the meeting itself and has no firsthand knowledge of what transpired at the meeting).  Per your email last week, can you please send the deposition transcripts so I can review and continue our discussion about the requested deposition – and, hopefully, avoid the need for motion practice?

Thanks in advance.

--joel

Joel M. Tantalo
**TANTALO & ADLER LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Main:     (310) 734-8695
Direct:   (310) 734-8693
Email:    jtantalo@ta-llp.com

---

**From:** Joel Tantalo <jtantalo@ta-llp.com>
**Sent:** Wednesday, September 8, 2021 12:29 PM
**To:** rpm@rpmlawny.com
**Cc:** 'David Olasov' <dolasov@olasov.com>; 'Scott O. Luskin' <SOL@paynefears.com>; Joel Tantalo <jtantalo@ta-llp.com>
**Subject:** RE: Hal Eisner

Ron,

My client contact at Fox didn't know offhand the answer to your question about unbroadcast footage, but she is looking into it.  I should know by tomorrow morning (my time), if not sooner.

--joel

Joel M. Tantalo
**TANTALO & ADLER LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Main:     (310) 734-8695
Direct:   (310) 734-8693
Email:    jtantalo@ta-llp.com

**From:** Joel Tantalo <jtantalo@ta-llp.com>
**Sent:** Tuesday, September 7, 2021 9:46 AM
**To:** rpm@rpmlawny.com
**Cc:** 'David Olasov' <dolasov@olasov.com>; 'Scott O. Luskin' <SOL@paynefears.com>; Joel Tantalo <jtantalo@ta-llp.com>
**Subject:** RE: Hal Eisner

Ron,

EXHIBIT 10
Page 33

Quick update: my client contact at Fox is out of the office until tomorrow.  I'll call you after I speak with her.

--joel

Joel M. Tantalo
**TANTALO & ADLER LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Main:    (310) 734-8695
Direct:   (310) 734-8693
Email:    jtantalo@ta-llp.com

**From:** rpm@rpmlawny.com <rpm@rpmlawny.com>
**Sent:** Friday, September 3, 2021 7:09 AM
**To:** Joel Tantalo <jtantalo@ta-llp.com>
**Cc:** 'David Olasov' <dolasov@olasov.com>; 'Scott O. Luskin' <SOL@paynefears.com>
**Subject:** RE: Hal Eisner

Joel:

        Before I respond to you, please answer one question for me. Do any outtakes from Mr. Eisner's interviews on June 29, 2018 still exist?

RPM

**From:** Joel Tantalo <jtantalo@ta-llp.com>
**Sent:** Friday, September 3, 2021 1:48 AM
**To:** rpm@rpmlawny.com
**Cc:** 'David Olasov' <dolasov@olasov.com>; 'Scott O. Luskin' <SOL@paynefears.com>; Joel Tantalo <jtantalo@ta-llp.com>
**Subject:** RE: Hal Eisner

Thanks, Ron (and sorry about calling you "Ray" when we got off the phone yesterday).  I disagree that your questions render the federal and state shield laws inapplicable.

First, the questions you want to ask Hal about whether the published reporting was a "fair and accurate depiction" of his interview with Joseph Luevanos implicitly would implicate his sources and unpublished materials because those questions really ask whether the unpublished materials are consistent with the published reporting.  Also, answering those questions could also open the door to cross-examination about his sources and unpublished materials.

Second, the purpose and public policy underlying both the federal and state shield laws is to protect journalists from the chilling effect that necessarily results from routine discovery into their newsgathering and reporting efforts.  That is why the federal qualified privilege has such a high bar, and why the state protection is unqualified.

That said, I would still like to pursue the relevance issue to its natural conclusion, in hopes that we can find a solution that avoids the need for court intervention.  Since, as I understand it, the basis for the questions you would like to ask Hal relate directly to the testimony that Ruth and Joseph Luevanos apparently provided at their recent depositions, can you please provide me with copies of their deposition transcripts?  As a non-party to this litigation, we lack the facts and context that are necessary to assess the relevance issue – whether under the shield laws or Rule 26.

EXHIBIT 10
Page 34

Finally, I am still waiting to hear back from Gibson Dunn about the prospect of a stipulation that would avoid the issue altogether. I called Marissa Mulligan after you and I spoke yesterday, but she was about to join a deposition and couldn't talk at the time.  I will let you know when I hear back from her.

I will be out of pocket tomorrow.  But let's talk on Tuesday or, if you are celebrating Rosh Hashanah, when you are back in the office.

--joel

PS:  I'm from NY originally, and have lots of family and friends out there.  The stories I'm hearing are horrifying.  I hope everyone and everything is OK for you and your family.

Joel M. Tantalo
**TANTALO & ADLER LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Main:   (310) 734-8695
Direct:  (310) 734-8693
Email:   jtantalo@ta-llp.com

**From:** rpm@rpmlawny.com <rpm@rpmlawny.com>
**Sent:** Wednesday, September 1, 2021 1:46 PM
**To:** Joel Tantalo <jtantalo@ta-llp.com>
**Cc:** 'David Olasov' <dolasov@olasov.com>; 'Scott O. Luskin' <SOL@paynefears.com>
**Subject:** Hal Eisner

Joel:

As I told you on the telephone earlier today, since we are seeking neither Mr. Eisner's sources nor any unpublished materials relating to his June 29, 2018 interviews of Ms. La Liberte and Mr. Luevanos, are subpoena to Mr. Eisner is not barred by either the U.S. Constitution, the CA Constitution or the CA Rules of evidence. Moreover, for the same reason, no "balancing test" or other, heightened requirement is applied here. Only FRCP Rule 26 controls. The information sought must merely be *relevant* to any party's claim or defense. Rule 26 says *relevant*, not dispositive.

It is my best information that both Joseph Luevanos and his mother, Ruth, have testified at their depositions that Mr. Eisner or Channel 11 cut parts of the interview before it was aired. In the interview and in the broadcast thereof, Joseph says that Ms. La Liberte was civil to him at all times. At their depositions both mother and son said that during the interview Joseph said that Ms. La Liberte was "civil compared to others", a less favorable evaluation of Ms. La Liberte in a lawsuit defendant is trying to prove that Ms. La Liberte is a racist. In these circumstances it is not only the exact words that matter, but how Ms. La Liberte spoke to someone whom defendant has described in her deposition as a "child".

RPM

EXHIBIT 10
Page 35

# EXHIBIT
# 11

EXHIBIT 11
Page 36

Page 1

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF NEW YORK

3

4    _____

     ROSLYN LA LIBERTE,              )

5                                    )

                    Plaintiff,       )

6                                    )

         vs                          ) No. 18-cv-5398

7                                    )

     JOY REID,                       )

8                                    )

                    Defendant.       )

9    _____)

10

11

12

13

14        VIDEOTAPED DEPOSITION OF JOSEPH LUEVANOS

15              Simi Valley, California

16            Tuesday, August 10, 2021

17                    Volume I

18

19

20

21

22   Reported by:

     LYNN GEARHART, RPR

23   CSR No. 9466

24   JOB No. 4741800A

25   PAGES 1 - 93

Page 2

1      UNITED STATES DISTRICT COURT
2      EASTERN DISTRICT OF NEW YORK
3
4    _____
     ROSLYN LA LIBERTE,        )
5                              )
             Plaintiff,   )
6                              )
         vs            ) No. 18-cv-5398
7                              )
     JOY REID,             )
8                              )
             Defendant.   )
9    _____)
10
11
12
13
14      Videotaped deposition of JOSEPH LUEVANOS,
15   Volume I, taken on behalf of Plaintiff, at 2655
16   First Street, Suite 250, Simi Valley, California,
17   beginning at 10:06 a.m. and ending at 1:10 p.m. on
18   Tuesday, August 10, 2021, before LYNN GEARHART,
19   Certified Shorthand Reporter No. 9466.
20
21
22
23
24
25

Page 4

1  APPEARANCES (Continued):
2
3  For The Witness:
4     COWDREY JENKINS LLP
5     BY:  ELIDIO LUEVANOS
6     Attorney at Law
7     1203 Flynn Road, Suite 160
8     Camarillo, California 93012
9     (805) 472-6050
10    eluevanos@cowdreyjenkins.com
11
12  Also Present:
13     JOHN REICHMAN, Esq., Gibson Dunn (Via telephone.)
14     RUTH LUEVANOS
15
     Videographer:
16
     JEFFREY NICHOLS
17
18
19
20
21
22
23
24
25

Page 3

1  APPEARANCES:
2
3  For Plaintiff:
4     OLASOV, LLP
5     BY:  DAVID OLASOV
6     Attorney at Law
7     485 Madison Avenue, 7th Floor
8     New York, New York 10022
9     (646) 583-5968
10    dolasov@olasov.com
11
12  For Defendant:
13     GIBSON, DUNN & CRUTCHER, LLP
14     BY:  MARISSA MULLIGAN
15     BY:  CHAPLIN CARMICHAEL
16     Attorneys at Law
17     333 South Grand Avenue, Suite 4700
18     Los Angeles, California 90071-3197
19     (213) 229-7000
20     mmulligan@gibsondunn.com
21
22
23
24
25

Page 5

1                   INDEX
2  WITNESS                EXAMINATION
3  JOSEPH LUEVANOS
   Volume I
4
5            BY MR. OLASOV        9
6            BY MS. MULLIGAN      71
7
8
9
10           EXHIBITS
11  EXHIBIT       DESCRIPTION        PAGES
12  Exhibit 1   Deposition subpoena          10
13
14  Exhibit 2   Video from council meeting   22
15       during the break
16
17  Exhibit 3   Video from TV news clip      25
18
19  Exhibit 4   Printout of tweet and retweet   27
20       by Alan Vargas dated 6/28/2018
21
22  Exhibit 5   Video of Hal Eisner interview   35
23       with Joseph Luevanos
24
25

2 (Pages 2 - 5)

Page 26

1  the law told you to hug Mrs. La Liberte?
2      MS. MULLIGAN: Objection. Misstates the
3  testimony.
4      THE WITNESS: Do I still got to answer?
5      MR. LUEVANOS: Let me just explain. Even
6  though they make objections, that's for a judge to
7  rule on later. So unless I instruct not to answer
8  for whatever reason I decide to make that, you still
9  have to answer the question.
10     THE WITNESS: Okay.
11     MR. LUEVANOS: Sorry. It's a little
12 confusing if you've never given testimony before.
13     MR. OLASOV: Okay.
14     THE WITNESS: No, I still -- I still do
15 remember the officer saying, "All right. Now make
16 up," if -- if my memory serves correct.
17 BY MR. OLASOV:
18  Q  And -- all right.
19  A  Wait, wait, wait. Okay.
20     MR. LUEVANOS: Take your time.
21     THE WITNESS: I think the officer said, "Are
22 you two on good terms?" And then it may have been
23 La Liberte that prompted the hug. Like, all right.
24 Let's prove we're on good terms, make up hug, bam,
25 the thing is done.

Page 27

1      But now that I think about it, I think my
2  memory's still a little bit fuzzy on that. It was
3  one of those two things. I'm -- yeah, it was
4  probably one of those two things.
5      MR. OLASOV: Let's mark as Plaintiff's
6  Exhibit -- 5, is it?
7      THE REPORTER: 4.
8      MR. OLASOV: 4? Well, okay. 4.
9      (Exhibit 4 was marked for identification
10   by the court reporter and is attached hereto.)
11 BY MR. OLASOV:
12  Q  Have you seen the tweet and retweet that's --
13 that's on this document before?
14  A  I think this might be my first time seeing
15 it.
16  Q  Do you know Alan Vargas?
17  A  No.
18  Q  Did -- Did Mrs. La Liberte say to you, in
19 words or substance, ever, that -- quoting from this
20 page -- "You are going to be the first deported"?
21  A  No.
22  Q  Did she ever call you a "dirty Mexican"?
23  A  No.
24  Q  Your appearance was -- was at a -- at a city
25 council hearing of Simi Valley, was it not?

Page 28

1  A  Yes.
2  Q  And it was not at a rally; is that correct?
3  A  It had the energy of a rally, but no, it was
4  not at a rally.
5  Q  Did Roslyn La Liberte ever say any personally
6  disparaging things to you?
7  A  Not that I heard, but I did hear that there
8  was some talk when I was speaking, and she was
9  talking to someone and said things about me,
10 negative things. I don't exactly remember what
11 because this -- this is secondhand information.
12 Someone told me about this after the time.
13  Q  And when did that conversation take place to
14 which you were referring?
15  A  The one where someone told me that she said
16 something or when she said something?
17  Q  The one when somebody told you that she said
18 something.
19  A  I think it might have been the day after.
20  Q  And who was it that said that to you?
21  A  I think my mom found out from someone else
22 that she was talking amongst her friends while I was
23 speaking.
24  Q  And that was the day after?
25  A  Yes.

Page 29

1  Q  And so that would -- this hearing was the
2  25th?
3  A  Yes. So I believe I learned of this on the
4  26th.
5  Q  So learned on the 26th. But that's
6  nothing -- you never heard any such thing from
7  Ms. La Liberte yourself.
8  A  No.
9  Q  Do you recall anything else about the
10 conversation you had with her during the hearing
11 break?
12  A  I think I remember bringing up the -- the
13 statistic that places with high amounts of
14 immigrants generally have less crime, and then she
15 said no. And I -- she said immigrants are criminals
16 or something along the lines of that.
17  Q  I didn't hear what you said. I beg your
18 pardon.
19  A  Immigrants are criminals.
20  Q  She --
21  A  Or something along the lines of that.
22  Q  Do you recall being interviewed by Hal Eisner
23 of Fox Channel 11?
24  A  Yes.
25  Q  And when did that take place?

8 (Pages 26 - 29)

Page 30

1  A  Like a few days after.  Like -- yeah, just a
2  few days after.
3  Q  And how did you come to be interviewed by
4  him?
5  A  My parents told me about it.  I think they
6  con- -- he or whatever organization he works for,
7  Fox, they contacted my parents.  They wanted to do
8  an interview.  Yeah, that's it.
9  Q  And -- and did they contact your parents more
10  than a day before the interview took place?
11  A  I do not remember.
12  Q  Did your parents agree to the interview?
13  A  Yes.
14  Q  Where did the interview take place?
15  A  On the grounds of city hall.  Not, like, in
16  city hall but outside, like near the library.
17  Q  Were -- were you accompanied by either/or
18  both of your parents during the interview?
19  A  By my mom.
20  Q  And, now, was there a part of your interview
21  that was video-recorded and another part that was
22  not recorded, or was it all recorded?
23  A  I think it was all recorded.
24  Q  Okay.  So you had no discussion with
25  Mr. Eisner before the video recording took place?

Page 31

1  A  We talked about how the interview would go,
2  like just stand here, make sure you look at the
3  camera, stuff like that.  But nothing about the
4  meeting.  Off camera.  Nothing about the meeting off
5  camera.
6  Q  So do you recall anything else about the
7  discussion you had -- was it with Mr. Eisner?
8  A  It was with Mr. Eisner and his cameraman.
9  Q  Okay.  But it was -- it only had to do with
10  where you were going to be?
11  A  Yeah.  Like how TV interview works.  Like I
12  got to look at the camera -- or not look at the
13  camera.  I have to look at him, ignore the camera,
14  stuff like that.
15  Q  Do you recall anything else that was said?
16  A  At the end of the interview they said -- the
17  cameraman said, "Where we got to go next?"  And then
18  Hal Eisner said -- I forget where, but it was where
19  they were going to go interview Roslyn La Liberte.
20  The cameraman said, like, darn, that's kind of far.
21  That's it.
22  Q  So tell me what was said in the interview
23  between Mr. Eisner and you, to the best of your
24  recollection.
25  A  So he asked me why I was there, like general

Page 32

1  stuff, like when I got there, how long was the
2  meeting, how long did I wait.  And then he asked me
3  about how the meeting went.
4  A  I said it was something.  It was -- it was a
5  bit chaotic, to say the least.  I told him about,
6  like, the loud -- there was some random guy in a
7  suit going "No.  No," because people with the signs
8  were chanting something.  I don't recall exactly
9  what, but it was people with "Love it or leave it"
10  signs so I can't imagine they were chanting
11  something good.
12  And then he asked me how the conversation
13  during the break time went, and then I told him
14  essentially what I told you, like I went up to
15  Roslyn La Liberte.  I wanted an opinion of someone
16  who was against SB54.
17  Conversation ensued.  She said her piece.  I
18  tried to say my piece.  She interrupted.  This went
19  on for some time.  And she got progressively louder
20  and louder as it went on.
21  Q  Is that something you told him?
22  A  Yeah.  So it was -- and then after that he --
23  he asked me how the conversation went as a whole in,
24  like, the context of the meeting.  And I said it was
25  civil compared to some of the other people out

Page 33

1  there, like, that were at the meeting, like some
2  weird old MAGA-hat-wearing man in his 50s.
3  He said something very loudly in my face.  I
4  don't recall exactly what, and that might have been
5  the "you're going to be the first one on the buses"
6  thing.  'Cause I was told later that's what he said.
7  I kind of zoned out because I was typing on my
8  computer.
9  MR. OLASOV:  Will you -- will you read back
10  that answer for me, please.
11  (Record read.)
12  THE WITNESS:  That's how I talk?
13  THE REPORTER:  Yes, sir.
14  BY MR. OLASOV:
15  Q  Do you recall anything else that took place
16  in the conversation between you and Mr. Eisner?
17  A  Once he was done interviewing me, and I think
18  I told you everything we talked about, he just went
19  on to interview my mom, and what she was doing
20  there, because she was also there.
21  (Reporter clarification.)
22  MR. LUEVANOS:  Just repeat that again.
23  THE WITNESS:  Okay.  Once he was done
24  interviewing me, I don't remember anything else, he
25  interviewed my mom, and that's it.

9 (Pages 30 - 33)

Page 34

1  BY MR. OLASOV:
2   Q   And did he interview your mother on screen,
3  on videotape or not?
4   A   It was on camera.  It was not in, like, the
5  piece he did.
6   Q   And do you have a recollection of saying
7  anything to Mr. Eisner about how Ms. La Liberte was
8  being treated publicly?
9   A   I remember -- this is where "the civil
10  compared to the other people" thing came in.  'Cause
11  I remember I said do not boycott her.  Do not do all
12  that stuff you're doing to her 'cause there are
13  other people who probably deserve it more.  Like
14  there -- like -- 'cause later I learned there's also
15  some guy from the --
16   Q   No. I want your conversation with him then,
17  not of what you learned later or believed later.
18   A   Okay.  Yeah, I told -- I specifically told
19  him do not boycott her 'cause there are -- 'cause
20  she was civil compared to a good chunk of the other
21  people there.
22   Q   Did you use in your discussion with him that
23  she was only civil in comparison to other people?
24  Is that something you said to him?
25   A   I do believe so.

Page 35

1   Q   And did you say to him, in words or
2  substance, that she did not deserve how she was
3  being treated?
4   A   Yes, in substance.
5   Q   Did you use those words?
6   A   Exactly, no.
7      MR. OLASOV:  So let's play for Joseph the Hal
8  Eisner interview.
9      THE VIDEOGRAPHER:  Which one is that?
10     MR. OLASOV:  And that should be -- that's it.
11  That's 5?
12     THE REPORTER:  Yes.
13     THE VIDEOGRAPHER:  Yes.
14  Ready?
15     (Exhibit 5 was marked for identification
16  by the court reporter and is attached hereto.)
17     (Video now playing.)
18  BY MR. OLASOV:
19   Q   Did you learn before your interview with
20  Mr. Eisner, Joseph, that there were reports of
21  people advocating not doing -- not -- others not
22  doing business with Roslyn La Liberte and her
23  company?
24   A   Yes.
25   Q   How did you learn that?

Page 36

1   A   My parents told me.
2   Q   Your parents told you.
3   A   Yes.
4   Q   Did you learn it -- do you know how they
5  learned that?
6   A   Social media.  Social media.
7   Q   Were you yourself active on social media?
8   A   No.
9   Q   And what did your parents tell you about what
10  was happening to her business?
11   A   That it was being boycott, and she lost a
12  deal with McDonald's.
13   Q   Did you learn anything else?
14   A   Not really.
15   Q   Did you -- did you ever tell Mr. Eisner
16  that -- that Roslyn La Liberte had been rude to you?
17   A   I don't think I ever said that.
18   Q   After this brief interaction with
19  Ms. La Liberte, did you ever have any further
20  dealings with her, any other conversations, either
21  that day or any other day?
22   A   No.
23   Q   So this -- this small interaction is the only
24  one you ever had with her; is that correct?
25     MS. MULLIGAN:  Objection.  Mischaracterizes

Page 37

1  the testimony.
2     MR. LUEVANOS:  You can answer.
3     THE WITNESS:  Yeah.
4  BY MR. OLASOV:
5   Q   Did you attend the city council hearing for
6  its entirety?
7   A   Yes.
8   Q   Were you seated with your mother when you
9  attended the hearing?
10   A   Yes.
11   Q   And where were you seated in the audience?
12   A   Front row.
13   Q   I'd like to play you now, as the next exhibit
14  number, a video excerpt from -- from the -- from the
15  council hearing.
16     THE REPORTER:  Be 6.
17     (Exhibit 6 was marked for identification
18  by the court reporter and is attached hereto.)
19     MR. OLASOV:  And the clip -- it's -- pages in
20  order.  And it's -- the times are hour 3, 59
21  minutes, 2 seconds through hour 4, 1 minute, 25
22  seconds.
23     (Video now playing.)
24  BY MR. OLASOV:
25   Q   You've heard this clip.  Was this the

10 (Pages 34 - 37)

Page 50

1    Q   Joseph, have you ever seen Plaintiff's
2 Exhibit 9 before?
3    A   No.
4    Q   Do you know who Dr. Nora Hernandez is?
5    A   That's my tia.  Or my other tia.
6    Q   And is she related to you on your father's
7 side or on your mother's side?
8    A   My mother's side.
9    Q   Did you tell her that Roslyn La Liberte
10 shouted at you?
11    A   I don't know if I ever spoke to her about
12 this.
13    Q   Do -- do you know -- do you have any
14 information as to who did, if anyone?
15    A   My mom.
16    Q   And did -- did your -- did your mother tell
17 you that she had told -- this is her sister?
18    A   Yeah.
19    Q   -- that the exchange was not civil?
20    A   Wait.  Could you repeat the question?
21    Q   Did your -- did your mother tell you that she
22 had told your aunt that the exchange between Roslyn
23 La Liberte and you was not civil?
24    A   Well, I told my mom what happened after the
25 fact 'cause she was in the bathroom for a good chunk

Page 51

1 of it.  And then she probably -- I know she told the
2 story to my tias.  And she probably told them what I
3 told her.  So yes.
4    Q   Do you know why your mother would have said
5 in the -- on -- on screen in that videotape that
6 they are having a civil conversation?
7    A   'Cause she didn't have all the context then
8 'cause, like I said, she was in the bathroom.  She
9 just walked out.  I'm there with my computer.  Some
10 lady's talking.  There's a crowd.
11        That hurts.  Wow, this collar's tight.
12        MR. LUEVANOS:  You can unbutton the collar.
13        THE WITNESS:  No.
14 BY MR. OLASOV:
15    Q   What part of your interview did Fox news cut
16 out, according to you?
17    A   Can you pull up the video?  There's a
18 specific part I noticed when watching it or
19 rewatching it.
20        THE REPORTER:  That's Exhibit 5.
21        MS. MULLIGAN:  Yeah, Exhibit 5.
22        (Video played.)  _____
23        MR. OLASOV:  Not that.  _____
24        (Discussion off the record.)
25        (Video now playing, Exhibit 5.)

Page 52

1        THE WITNESS:  Can you fast forward a little
2 bit?
3        THE VIDEOGRAPHER:  You can do it on your
4 screen.
5        THE WITNESS:  Oh.
6        THE VIDEOGRAPHER:  You're probably better at
7 it than me.
8        THE WITNESS:  Right there.  Right there.  So
9 right there, the cutaway.  When I do this, I'm about
10 to go on, like, a tirade.  So I only had one finger
11 out and not two.  I just had one.  So they cut right
12 there, and I think that was the bit right before I
13 said, "'cause she was civil compared to some of the
14 other people there, but there were other people that
15 deserved it more."  That would have been three
16 fingers.  There was only one.
17 BY MR. OLASOV:
18    Q   You think this was edited.
19    A   Oh, that was edited, that part right there.
20 Like I have friends who do, like, editing whenever
21 there's, like -- whenever they want to do, like, a
22 funny cut, they just get their little clip, and then
23 before the rest of it's -- like go on, they fade
24 away like that.
25        (Video now playing.)

Page 53

1        THE WITNESS:  You don't stop after one chop.
2 You do, like, chop, chop.  You don't -- you know.
3 And you're, like, going on this?  You got to get
4 edits, like a few of them, you know.  So it's
5 definitely edited.
6 BY MR. OLASOV:
7    Q   That's your testimony.
8    A   Yeah.
9    Q   So you -- you said to him, "I don't really
10 want this upon -- it's like she doesn't deserve it
11 because she was giving her opinion in a place where
12 everyone should be able to share their opinion."
13 That's -- that's what you said.
14    A   Yeah.
15    Q   Are you -- is it your testimony that you now
16 regret having said that?
17    A   I regretted it, like, a day after saying
18 that.  It was like I said, I learned she lived
19 outside Simi Valley, and then I thought about it.
20 I'm like, dang, maybe she did deserve it.  But now I
21 regret it even more when later I found out she,
22 like, punched someone with a sign.
23    Q   How did you learn that?
24    A   Well, it blew up.  When you punch some guy --
25 no.  It was punch some -- some high schooler with a

14 (Pages 50 - 53)

Page 54

1 sign, it's going to blow up. And especially 'cause
2 it's the same person that yelled at me earlier, I'm
3 like, well, it blew up. My parents found out about
4 it and then showed me.
5    Q   Did you ever see that videotape?
6    A   Yeah.
7    Q   Did you not see that the young lady was
8 assaulting Ms. La Liberte?
9    A   I did see that portion of it, but it -- from
10 what I remember of the clip, La Liberte swung first.
11   Q   Is that your recollection?
12   A   Yeah.
13   Q   And so if you have that wrong, how would that
14 affect your testimony today?
15       MS. MULLIGAN: Objection. Argumentative.
16       THE WITNESS: I don't care. She still
17 punched someone. Be the bigger man.
18 BY MR. OLASOV:
19   Q   I beg your pardon, son?
20   A   Be the bigger man. She -- she should have
21 learned this when she was doing it to me.
22       THE REPORTER: She should what?
23       THE WITNESS: She should have learned this
24 when she was doing it to me. Or not like exactly
25 what she was doing to me, but when she was doing

Page 55

1 this (indicating.), she realized how bad it looks.
2 Don't -- I don't -- where's the restraint? You got
3 caught once with your hand in the cookie jar, and
4 then you go in for another cookie. What -- what do
5 you expect?
6 BY MR. OLASOV:
7    Q   So that your testimony is today that although
8 you said that she was civil to you, you do not feel
9 today she was civil to you. Is that it?
10       MS. MULLIGAN: Objection. Asked and
11 answered.
12       MR. OLASOV: That's not an objection to form.
13       THE WITNESS: Back then I had a lot more
14 optimistic view of the world. I'm going to be
15 honest. So when she was doing this, I was still
16 looking at my laptop. I was like na, na-na, na-na,
17 na-na, like little old freshman me was, or, like,
18 freshman transitioning into sophomore was.
19       And then the more I thought back on it, the
20 more I realized this isn't normal. Why -- why --
21 huh? You know.
22       I'm sorry. I don't know how to put this into
23 words. So I did say, she was civil back then, but
24 I -- I do remember, clearly, I said she was civil
25 compared to other people. And now I look back on

Page 56

1 it, doing this -- right? -- the yelling, the
2 bringing up your parents again in Indonesia, even
3 though I kept asking "What does that have to do with
4 anything?" and she didn't explain herself, that's
5 not civil. It's not.
6 BY MR. OLASOV:
7    Q   Do you have any other regrets about your
8 interaction with her?
9    A   No, not really.
10       MR. OLASOV: Let's mark as the next
11 exhibit --
12       MS. MULLIGAN: Objection. That's
13 unnecessary.
14       (Reporter clarification.)
15       MS. MULLIGAN: I said objection. That's
16 unnecessary. It's argumentative.
17       THE REPORTER: Okay. This is 10.
18       (Exhibit 10 was marked for identification
19   by the court reporter and is attached hereto.)
20       MR. LUEVANOS: Probably seen it, but thank
21 you.
22       MR. OLASOV: I should think.
23       MR. LUEVANOS: Could we put the video off the
24 screen?
25 BY MR. OLASOV:

Page 57

1    Q   Can you identify Plaintiff's Exhibit 10?
2    A   Yeah. This is what I wrote for my tia Tita.
3       (Reporter clarification.)
4 BY MR. OLASOV:
5    Q   And that's your father's sister?
6    A   My mom's sister.
7    Q   Your mom's other sister.
8    A   Yes.
9    Q   And when did you prepare this?
10   A   I sent it to my tia in, like, April, but I
11 think I started writing it back in, like, December
12 of last year, December or Septem- -- it's -- I wrote
13 this, like, over six months ago. At minimum,
14 February.
15   Q   Of this year.
16   A   Yes.
17   Q   And how did you come to write this? Were you
18 asked to write something?
19   A   Yeah, my tia wanted me to write this.
20   Q   And tell me what the process was of preparing
21 this document.
22   A   Well, I thought about what happened, to the
23 best of my knowledge, and then I wrote it down. And
24 I did some revising and bam.
25       (Reporter clarification.)

15 (Pages 54 - 57)

212-267-6868

Veritext Legal Solutions
www.veritext.com

516-608-2400

EXHIBIT 11
Page 43